Case 22-6014 and 23-5439, American Reliable Insurance Company et al. v. USA. Arguments not to exceed 15 minutes per side. Mr. Toflon, you may proceed for the appellate. Good morning, Your Honor. My name is Jonathan Toflon. I'm appearing for the plaintiffs, the subrogated insurers. We'd like to reserve five minutes for rebuttal. Can you keep your voice up? Yes, Your Honor. Again, my name is Jonathan Toflon. I'm representing the plaintiffs. We are both appellants and cross-appellees. As cross-appellees, this concerns the failure to warn issue. The Sixth Circuit has recently held in a related case Abbott v. United States. They've decided the failure to warn issue, and we believe that consistent with Abbott, that part of the case should be remanded to the district court for further proceedings consistent with Abbott. All the facts and law are the same. Again, we're the insurers, and those were the individual plaintiffs. Has any process happened on the remand after Abbott yet? I believe a deposition has been completed due to the health of the deponent, but I'm not sure that there has been much more. Okay, but not to go into Abbott. There's a lot of sort of wiggle room as to what happens on remand. You're saying we should just remand this the same way, though, and let it proceed. That is the standard about making the assessment and so on. It wasn't just a slam-dunk remand. The remand has to go in various intricate ways that both sides might get some win on. Is that fair? That is correct, and it is a published opinion. As far as you're concerned, do you want to argue about the rest of it? Yes, sir. It's a published opinion with three different opinions. We are appellants as to the fire management claims. We believe the district court should be reversed. There's three issues, three policies at issue here. It's whether the Park Service used the required command structure in responding to the Chimney Tops 2 fire, whether the Park Service monitored the fire in compliance with their monitoring schedule, including monitoring overnight, and whether the Park Service utilized the WFDSS, that's Wildfire Decision Support System, in compliance with their fire management plan. Those are the three issues. The first step under Sixth Circuit precedent in a discretionary function case is to define the conduct. We believe that the district court did this correctly. The conduct here is just, as we've said, in the context of the policies that we have alleged. Did the Park Service follow the required command structure? Did they monitor in compliance with their monitoring frequency schedule, and did they utilize the WFDSS system in this fire? The government, however, is once again attempting to define the conduct broadly to encompass all firefighting efforts that were implemented to the Chimney Tops fire. They're saying, they're characterizing it as firefighting efforts, firefighting suppression activities, all decision making that went into that. If you zoom out that far and define the conduct that way, it is going to encompass discretionary. Isn't that, there's a Fourth Circuit case that I think is consistent with that, that Judge Wilkinson wrote, Blanco, Ayala, something like that. Am I right about that? That you can't just parse it, you can't segment everything out, right? There is some generality, there is some zoom out that has to happen. Not at, I would respectfully disagree. I know we've got the case, the fire pit case that Judge McKee wrote that would say, I take it you would say no, that there's some granularity that has to go with it. Is that right? Yes, Your Honor. It depends on, we're at the 12D1 stage. And this is, we have to go with how, at this point, we believe the court has to examine how the plaintiffs have pled. Each of the violations of policy. And so we are only examining the conduct that plaintiffs have alleged approximately caused their damages. Not, we're not analyzing negligence, we're not analyzing the underlying facts of the case, only the conduct. And so, at least at this stage, their discussion that none of their problems, if they were problems, made any difference. We shouldn't look at that because that would come at the merits stage, not at the jurisdiction stage. Absolutely, Your Honor. You can analyze that two different ways. That's either a misdefinition of the conduct as being too broad, encompassing all kinds of discretionary conduct. Or it is attacking proximate cause, which is an element of our case that we have pled. And they have not attacked the way that we've pled proximate cause. So at 12D1, that has to be admitted. Isn't there, and again, I'm blanking on the names of the cases. But the government cites a couple of cases, and we suggest in their brief that there is some peak at causation that you could make at this stage. I take it there's a Third Circuit case, I think, and maybe I'm not sure where the other one is. Isn't our ice dam case where in the end Judge Merritt says, well, when you look only at the non-discretionary stuff, it wasn't enough to cause any damage and dismiss that. It's the one about the ice dam that forms in the government-controlled dams and hydro plants. Yes, sir. I believe that is an extraordinary example. If at the pleading stage a court says there is no proximate cause here, without allowing the plaintiffs any discovery, without allowing them to prove that this indeed caused their damages, that is an extraordinary measure. And the common law across the country says that a proximate cause issue generally is a question for the trier effect. Humor me for a second. How is the command structure? I mean, the command structure seems like it could be a decent claim. It seems like you have to have different people in these positions. How does that link to the damage here? Yes. I mean, how would it have been different if there had been a different person in each role? Yes. So I think I could best answer that by going to the park manual. Each of these roles, fire management officer, incident commander, and fire duty officer, they have responsibilities which are spelled out exactly as to what they must do in the event of a wildland fire. So the fire duty officer, they have to be inputting information into the WFDSS system. They have to be interfacing with other jurisdictions. They have to be overseeing warnings. Everything office related is sort of the way that it's divided. The incident commander is the one in the field. He's actually commanding forces. He is not at a position where they can monitor. They're not at a computer. They can't perform the functions of the fire duty officer. That's why throughout the National Park Service, it is banned. They are not allowed to be both an incident commander and a fire duty officer because they're completely separate jobs. Is it just a matter of resource allocation? Like one person, they just don't have enough time to do it all, and if they had had three people, it would have been a more efficient way to address the issue, and therefore the fire wouldn't have spread? I'm struggling with how the command structure works with actual damage, like the fire suppression problem. Well, Your Honor, as the ABA court found, all of the issues, if you read the NPS report, the after action report from beginning to end, all of the issues are interrelated. In this case, we have one person attempting to do everything, and that is unsafe. That's why it's prohibited. One person cannot do everything that is required in a wildland when we have this much interrelation. There's a little difference. When you say prohibited, you're saying it's because it says you do it this other way, and I guess my problem is I get the idea that the manuals say do it this way, but we know about government bureaucraties that these are hundreds and hundreds of pages of how to do things, and there are some things the government points out that says, well, but you can do things a little different, so we're sort of fighting about bureaucratic language without, as I think Judge Nalbandian was hinting at, a strong feeling of the connection, and so when you have a lot of manuals, you can find something that people do wrong, right? Well, yes, Your Honor. Let me give you an example of this door that blew off. Looks like they didn't put the bolts in, period. But I know a lot of these things say, well, when you put the bolts in, it's got to be checked off by Sam, and it's got to be checked off by a guy above Sam. Maybe they didn't do that. And you say, well, wait a minute. That doesn't seem to be the problem. So do we not look at causation at all? And as long as you say the paperwork was wrong, you violated a mandatory, that's my problem from both sides, because on the other hand, if we take the strong view of what I just said, the government's never going to be liable. So how do we parse that out? Well, I think we have to take it one stage at a time, Your Honor. Well, what's your best case where a court has said, okay, you didn't follow this line in the manual, and therefore it was mandatory, therefore the government does stay on the hook? What's your best case? Well, the case that is most factually similar is the Florida Department of Agriculture case v. United States. And that is a case where the after-action report found that the government violated, the after-action report authored by the government found that the government violated mandatory policy in implementing their burn plan. And the name of that one is? That case is the one where they ignited the fire, right? There was no fire suppression involved. Doesn't that kind of, I mean, there are any of a number of fire suppression cases, you know, hardscrabble, Kernovich, whatever the new one is, there's the Ninth Circuit, I mean, whatever. Why are they all not more analogous than, I mean, they're all court of appeals opinions, the one you're talking about is the district court opinion, not that I don't respect our district court colleagues, but, I mean, we're talking, you know, now we're looking at maybe a circuit split if we were to go the other way. Why are those cases not the ones that we ought to be looking at? Well, I don't think it's a circuit split because those are mostly for summary judgment cases, like hardscrabble, even the Florida Department of Agriculture, those are summary judgment cases. And in that case, the court would then be in a position to analyze the underlying facts and underlying policies. Yeah, but, I mean, at a higher level of generality, if we said, look, we reject the principle, and I think we would have to reject the idea that, you know, that some mandatory language doesn't get you there, right, in the face of the kind of discretionary nature of the activity, you know, that principle, and if we say, well, we don't agree with that, right, because we have mandatory language with the monitoring, the command structure, with the decision plan, and that's enough, as opposed to, I think, in the Tenth Circuit, they would say, well, yeah, okay, maybe there's some mandatory language there, but this entire exercise is discretionary, so we're going to go with that. I think we have to disagree with that to come out your way, don't we? No, because this is an extraordinary case, and it's because of the after-action report. In none of those cases across the country, Tenth Circuit, Ninth Circuit, none of those cases have an after-action report written by the policy experts of the National Park Service which found that the government violated mandatory policy. That does not exist in any of those cases except for the Florida Department of Agriculture. Although in most of the after-action report, it does say this one, it's unlikely to have actually affected things. So maybe down the road that would hurt you. Let me ask you about the Mays case. It's true that that's a district court case, but I thought maybe that was the most impressive on your side because the court actually says ignoring policies and procedures or the failure to have in place policies and procedures are not discretionary decisions. And apparently that case wasn't appealed in my research. Are you familiar with that case? Yes, Your Honor, and we think that that case really nailed the analysis because it's focusing on the conduct. At that point, the issue at this stage is the challenge conduct. That's what the Mays court said. We have to focus at the challenge conduct, not the ultimate result of the conduct. And that is the entire focus of the government. Let me ask you, with these three claims, if for whatever reason we ended up saying, well, you're right about some, but you're not right about others, is that likely to affect the outcome? In other words, are you desperate to win on one of the three and the others are not as important? I couldn't quite get the feeling of how that, obviously the failure to warn is a separate thing, and either you win or lose on that, but as amongst these three that are somewhat interrelated. Well, and these are interrelated with the failure to warn claim as well, particularly the WFDSS, because that requires the Park Service to input all kinds of information in order to get a decision. And so when you run a WFDSS decision. Although since you've raised that and helped me here, maybe it's my fault. Somehow the WFDSS, it's talking a lot about documenting stuff and things that's going to happen later. And somehow I don't have the feeling that somebody's, you know, documenting things and that tells us whether the cell towers are going to blow up when we're trying to warn people. I mean, the WFDSS seems the most bureaucratic of the three claims and the command structure is kind of the most direct that you're trying to figure out how to handle this and you're screwed up from the beginning. You don't have a structure to manage it. You know, it's not the general, the colonel, and the captain that repel the attack. It's you just got a bunch of people flailing around. So tell me why the WFDSS is so important, if it's important. Well, it's because it's a very complicated system. So there's a lot of data that needs to go into that. If they would have, just for instance, if they would have put in the fuel, there's all different sorts of gauges that they have to enter regarding how dry the surrounding fuel is, how fast the wind is. And it actually simulates, it comes up with a number of... Does Zelensky have been the one that knew all that stuff and didn't put it into the system? Or who would have put it... No, the Park Service plan says the fire duty officer was supposed to be doing that back at the home base if Zelensky was operating as the incident commander. And that's why he couldn't do both. And there's a third position, the fire management officer or something? Yes, sir. What does he do as opposed to the duty officer and the incident commander? The fire management officer is sort of overseeing everything. The fire management officer is part of the fire management committee, which is another component of this WFDSS system. The fire management officer is one of three that have to approve a WFDSS plan. And then they have to then bring it to the superintendent, who then has to sign off on it and give the delegation... What is... I mean, that's what, to me, what I call bureaucratese is this fire is going on. There are people out there. The park superintendent is signing off on pieces of paper about how they're fighting the fire? Yeah, and there are no allegations in this... There's no allegations at all from the government. But there's nothing that there's exigent circumstances that would call for sort of streamlining any of this. This is all required, and the National Park Service after-action report found that this was all required. They're all on vacation for Thanksgiving. They were, and they were never called back. And remember, this occurred over six days. This was not an immediate thing. There was plenty of time for this to be properly done. Let me ask you about that system. You know, I'll just call it the system. Was it just to, as Judge Boggs, is it just to document after the fact, or was it actually to help fight this particular fire if they had inputted the information? I mean, if it was just good information to know for future use, it obviously wouldn't have any proximate cause issue. Well, it has... This has to be done on the front end to develop the plan because it tells you what the fire is going to do. It has near-term fire behavior models that it inputs based on the future weather, based on how dry everything is. And so this is the system that tells the Park Service whether or not there's an off chance that this fire is going to escape their... Well, as a part of this then, are you claiming a failure to train then? Well, that is exactly the conclusion of the National Park Service report. The after-action report says that they didn't understand that they had to use this. And that's why they didn't know that this fire was going to leave the park. But the question of whether the system would have said that, again, you're saying that's left for causation. Because, again, obviously I'm not a firefighter, but reading all of this, you're saying that there were six days and so on. It really looks like it really was low-level and then the last 12, 24 hours everything went to hell. That's right, Your Honor, but it was well... Those wins were well-predicted, unfortunately. I think you've exhausted your time, but you'll have your rebuttal and we'll hear from the government. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Jeff Sandberg for the United States. We are not asking you to decide anything about causation now. We are asking you to decide whether relevant officials had discretion where it mattered. And I think the right way to look at this case is... There are causation cases that you allude to it in your brief. That's true, but let's start at the beginning here, which is figuring out was there room for judgment or choice in the decisions that matter here. And this goes to where my colleague started about the level of zoom we're looking at this case at. And he's saying we're trying to zoom out too far. We're talking here about what was the conduct that they alleged that led to their injury ultimately. And the reason why the hardscrabble case and the Knezovich case and the Miller case and the Esquivel case looked at it at the level of fire suppression is because the fire is what ultimately, unfortunately, burned the land that these insurance companies are now on the hook for damage to. You don't focus on just a particular manual provision in isolation to figure that out. So you have to put yourself in the shoes of the fire management officer and say, do I have a specific set of marching orders set out for me in this plan? If I could just prove as a matter of tort law, if I could just prove that the fire monitoring, that your failure to adequately monitor the fire did cause my damage. I mean, okay, it's a but for cause, maybe or maybe not approximate cause, but that's for me to prove. If I could do that, why would it matter whether the other stuff was discretionary or not? It's like you're supposed to monitor this fire every 30 minutes or whatever it is. You didn't, there were whole sale times that it wasn't being monitored. I can prove that that caused me an injury. Why isn't that it? If that was mandatory language, why wouldn't that be it? Well, that's the problem. It wasn't mandatory and it also wasn't specific enough. It didn't set out a specific course of action that had to be followed. They're leaning on, the most general statements, the most formal statements say, all wildland fires must be monitored. Well, this fire was monitored. It was monitored. What they worked out was that they watched it during the time that they could actually see it because the fire for most of its history was smoldering. It was not burning. You could not see it. So at night, do you want to have your limited staffing resources devoted to watching things you can't see? No. The most granular thing they get to is a fire monitoring handbook, which says by its terms that the recommended guidelines for monitoring, and it doesn't say anything about overnight. It doesn't say anything about staffing resources. It doesn't say anything about smoldering or burning. It just says every 30 minutes. And then my opposing colleague says, well, you should think that that became mandatory because there are other documents up the chain that incorporate by reference. But if you look at the incorporation by reference, it doesn't say we are making this 30-minute monitoring schedule mandatory. It just says look at the fire monitoring handbook. It's the classic bureaucratic thing. You shall, in doing your job, adhere to the following 25 things. And it says fire monitoring handbook. So they're trying to follow an incorporation by reference down to something that is ultimately, they agree, a recommended set of guidelines. So I agree with Your Honor that if there had been something that said you must monitor overnight, whether you can see it or not, every 30 minutes, and they could allege that that caused their injury, then yes, that could go forward. But they can't show a specific course of action with it. Okay. So let me ask you this. There's two things, and maybe they're analytically the same or maybe they're separate. I don't know. There's the idea that there's language that may look mandatory, but when you look at it in the context of what these documents are and the general language, they aren't in fact mandatory. Or we have the cases that say, and you know the language comes from Miller, the existence of some mandatory language doesn't take away from what is an overall discretionary function. Okay. Are those two separate concepts, and you would win on either one, or are they essentially kind of the same because the general language is essentially not taking away from the mandatory language per se, but it's really that concept that it's all discretionary or the function is? I think it's parsing things finally to draw the distinction. I understand the distinction, but the two concepts are related in that they're ultimately trying to get at the sense of was there a specific course of action dictated here? Was there, as in the Berkovits case, a directive to check every single lot of vaccines before it is released to see whether it's contaminated? Here, there's nothing that says here's exactly how you have to monitor the fire. Here's the strategy you must take to monitor the fire. My opposing colleague recognizes, of course, that there's lots of judgment calls there. Okay. What about the command structure? It seems pretty clear that you're supposed to have three different people in these three different positions. Is that, that's not? We think that that is best practice called for by the interagency standards handbook. We agree. This was an exigent circumstance. There were folks on Thanksgiving. You had Officer Solansky who was a type three incident commander. That's a pretty senior qualified incident commander. He's a fire management officer. It means he knows the park really well. He's been there for a long time. The fire management officer is the person who has a long-term responsibility for understanding the park. The incident commander is the person who wears the chief hat for a specific fire. There have been 12 fires previously that fire season that they had dealt with before. Then there's a duty officer who plays an auxiliary role. Well, Officer Solansky knew how to do all these jobs. Yes, he was wearing multiple hats. I sort of take my opposing colleague to be making a very strange argument, which is that those other duties just shouldn't have been performed unless and until you could line somebody up to do them. Isn't there a, quote, a step-up plan that tells you how to bring in resources in which they didn't step up until, as I say, everything went to hell? Again, yes. I mean, as a matter of best practice. But I don't see a specific set of marching orders to follow. And more importantly, I don't see, I mean, there's no Tennessee law tort called wearing too many hats at once. If they survive this motion to dismiss, what ultimately is going to happen is the court is going to have to decide for itself under general Tennessee law standards, did they negligently fight this fire or not? I mean, it's a very win-win in the end, but that doesn't decide our question, does it? No, yes, it does. Because the point is that Congress only wanted federal judges to apply state tort law standards in situations where a federal officer had a specific set of marching orders that they didn't comply with. That is the circumstance in which the Supreme Court tells us and Congress has told us. Well, and let me bring in the second part, which is, as I understand it, is the second part of Gaubert is, was the discretionary choice made as a result of policy? So that, for example, I suppose if you say, well, we're never going to have the resources, so one guy is always going to have to wear three hats in the Smoky Mountains. Well, maybe that's a policy. But here, I don't see anything that would say that the decisions that were made, especially about the command structure and especially about even knowing that you had to use the system, were as a result of any policy fought through. So I'm glad you brought that up, Judge Boggs, and the Mays case before which you mentioned, because the question you posed about the Mays case is about the second prong of the analysis. If you look at the analysis in the Mays case of the first prong, the court does exactly what I'm telling you here. Is there a specific set of marching orders set out? No. Then they move to prong two. At prong two, you're figuring out whether the room for discretion that has been narrowed in any way by step one is what's left enough to preserve some room for policy discretion. So in both Mays and in this court's decision in Myers, the court said, okay, you survived step one, but at step two, what you're left with in terms of relevant conduct is just so technical and ministerial that it's no longer infused with policy judgment. Here, although we dispute that it's mandatory, but even if you assume that it's mandatory, that you can't have one person wearing multiple hats in exigent circumstances, you still have all of the discretion in terms of figuring out how to fight this fire. Maybe we're on the same page, maybe we're not, so help me here. As I understood the overarching law is in order for the government to get out of jurisdiction, choices that are even if not discretionary can get you out if they were made on policy basis. Isn't that the second step of Galbert? We have to run the gauntlet. We have to show that there was an element of judgment or choice, which means that there's not a specific set of marching orders. And then we have to show that what that element of judgment or choice was left with is something that involves trading off safety against resource allocations. Are you going to poison the Gatlinburg water supply if you use this particular fire retardant? Is the firefighter pilot going to get hurt because the wind conditions are high enough? I mean, all of the decisions that unfortunately you fail to anticipate how this fire might spread. But here they're not charging you with having the helicopters and the planes flying and so on. No, they're not. But those decisions, the structure for making those decisions was faulty. I mean, it's like the language that I was quoting from Mays, that either you didn't have principles or procedures or you ignored them. I mean, do you disagree with Mays that those are not discretionary decisions? I don't recall the precise fact. I'll read it again because I read it out. It says, ignoring policies and procedures and the failure to have in place policy procedures are not discretionary decisions involving the permissible exercise of policy judgment. This is the coal ash case, right? Right, right, yeah, yeah. That's not right. I mean, the discretionary function exception applies whether or not the discretion involved be abused. So first you look, is there an element of judgment of choice? And then the second step, I can't recall whether Mays is before or after the Galbert case, but the Galbert case actually says, and this court has said four or five, six times, you start with a presumption that it is infused with policy considerations. And it's not hard to see how decisions about fighting a fire involve trading off safety against resource allocation, staffing. It's long after Galbert. Long after Galbert. All right, well, then it failed to apply Galbert or, for that matter, this court's decisions in Rosebush and Cole and A.O. Smith and Montez and Edwards that recognize that there's a presumption. I wanted to address the wildlife fire decision system. The questions that asked, well, is this just about documenting things as you go along? That's absolutely true. If you look at Appendix N to the Red Book, that's the interagency standards, and plaintiffs cite to that in their complaint, it tells you what this system is. It's about logging the information, logging your decisions as you do them, and it interfaces with substantive decision-making models like the near-term fire behavior, the relative risk assessment, the complexity analysis. But guess what? We did those things along the way. What we didn't do and what the after-action report faulted us for was that not everything was logged in real time. The decisions that were being made weren't being written down, and that's very similar to the decision checklist that wasn't filled out in the hard scribble case where the Tenth Circuit said, okay, we think you had a mandatory duty to fill out this decision checklist. You did something wrong. You violated bureaucratic rules. However, we still think the discretionary function exception applies because what matters here is how you fight the fire, and the fact that you didn't complete the checklist didn't constrain you. If they had logged these things in in real time, maybe that would have affected the decision-making to fight the fire. That's certainly not how the Tenth Circuit saw it because it doesn't actually give you a specific set of marching orders. The question is not causation, Your Honor. The question is, was there a specific set of marching orders that they had to follow? And I think my colleague tries to portray it this way. If the decision system was you input a bunch of things and then AI tells you, here's exactly what you have to do to fight this fire, then I would understand why they would say this failure is one that, you know, failed to adhere to a discretionary function. But this is just a heuristic tool to work through that, you know, raises ideas for your consideration. It doesn't actually tell you. Did that go to causation at the summary judgment stage? In other words, is it enough what they alleged to at least get them past the jurisdiction stage? If this case were ultimately about causation, if we're coming down to causation, then I understand that, you know, this could be resolved in a factual posture on remand in 12B1, which is what's maybe happening on the failure to warrant side of the case. We're not asking this court to decide this case on causation. We're asking you to decide whether there was a specific set of marching orders that Officer Solansky and his colleagues had to follow. And there's a reason why lots of these cases don't proceed. Just in general, challenges to government responses to disasters, just like challenges to government regulation of banks or government decisions about how to make a park safe for visitors versus recreationally beautiful, these kinds of things don't usually get off the ground under the FTCA because what Congress contemplated for the FTCA was garden variety negligence. And let me come back to the zoom point. If Officer Solansky had been, you know, working on this fire, he's tired, he falls asleep at the wheel, he drives into the plaintiff's property, hits a propane tank, starts a fire, it would be inappropriate for me to try to zoom out and say, well, you know, yeah, it was a car accident, but he was staffing decisions about having somebody who was tired and telling him to drive on this road. And, you know, that's the kind of zooming out that I think Rosebush and other cases are really concerned about. But here we're talking about, they're saying that they're paying for fire damage on properties. They're saying that this fire escaped the park. They're challenging the suppression, you know, the causal mechanism here is that the fire wasn't suppressed and it left the park. And so you need to look at it at like a sensible level of generality here. And I think that that's reflected in Judge Wilkinson's decision, that's reflected in Rosebush as well. What's the case that, do you know the name? I don't, I don't offhand. All right, we'll look it up. We'll look it up. I'm just trying to. Wilkinson's? Yeah. It's Blanco Ayala, I think, or Blanco. Yeah, I don't recall that one in particular, Your Honor, but there are other Fourth Circuit cases we cited that make the point that, like, look, these are guidance documents. They often use mandatory language. Are we really going to have a system where federal court jurisdiction rests on a game of read everything, see if you can find one thing that was violated? I mean, we want agencies. I have a question, Counselor. Time's running short. Do you have a comment on the failure to warn on Abbott? Yes. Yes, we agree that. Other than send it back. Right, well, the insurance, in these cases, the insurance cases, the district court said, I'm denying the motion to dismiss on the failure to warn for the same reasons I denied it over there. So we think it follows as a matter of logic, you know, if not precedent, that this case should go back for the same reason. And I would just note, those cases are actually being stayed, pending the outcome of this one, in the hope that the failure to warn claims can proceed with the depositions for jurisdictional discovery all at once, so we don't have to pull people away from their fire management duties twice. And also the plaintiffs in those other cases, they brought these same command structure WFDS monitoring claims over there, and then they actually expressly abandoned those claims, recognizing the force of the government's discretionary function exception argument. So if you affirm on their appeal, and you vacate and remand on my appeal, the cases will be, you know, proceeding on parallel tracks, it will be the same claims at issue, and that's what we're hoping for here. If there are any other questions, I'd be happy to address them. I will stand on our briefs. Thank you. I'd like to address specifically the Miller case, and that is the issue where the court in Miller says the mandatory, it acknowledges that in the manuals, the policies are mandatory, just like in this case. But it doesn't say how and when to apply those policies. I think there's a really big difference. If you analyze those mandatory policies in Miller, that's the Ninth Circuit case, compared to the mandatory policies here, the mandatory policies had to do with the actual movement or allocation of resources. One of the mandatory policies is the Park Service must put firefighting resources next to the firefighting efforts. They must position them correctly. In that context, it makes sense to say, well, it doesn't say exactly how and when. The government can say, well, we did put it, you know, close, and close enough. So there was a lot of ambiguity in the mandatory policies. So, okay, let's say Miller may or may not be an analyst. What about hardscrabble in, I don't know how you pronounce it, the recent Tenth Circuit case, the one with the K, Karanovich, or whatever. Those seem closer to me. The checklist, I mean, why are those, again, I guess I asked this the first time, but why are those not closer, certainly closer than Miller, aren't they, to our case? Are they closer than Miller? They're a little bit closer, I guess, because they mention the WFDSS system in that case. But the checklist in Miller, or I'm sorry, the checklist in the Tenth Circuit, the hardscrabble case, and the WFDSS, those are two different systems, two different things. Right, but I think the answer was if you had gone through the checklist and you would have answered these yes, and then X, Y, Z would have happened. But the fact that it's mandatory wasn't enough to overcome the ultimate discretionary function here, or the ultimate discretionary thing, which is fighting a fire. And so that, I mean, that runs into that language from Miller. You know, some mandatory language, the existence of some mandatory language is not enough, essentially, when the overall thing is discretionary. And I guess I'm still struggling with that and how we would get around that if we were to come out your way. Yeah, well, the WFDSS system is very different from a checklist because it contains mandatory requirements. It contains basic safeguards. So we don't have discovery into that entire system, but we know that it does contain park requirements that had to be followed in formulating a decision. You know, for example, if it was a fire in the FM2, I think it's FMU2, location of the park, and it was not naturally occurring, it had to be suppressed. It couldn't be monitored, those things. So it would say whether or not your plan is in compliance with park requirements, or it would say there is a risk that this, with your plan, your containment plan, will exceed your containment boundaries and affect park neighbors, which in turn would then affect whether or not they had to warn park neighbors. So this system is much more robust. It contains guardrails when making decisions, and it's required to be approved by a committee and approved by the superintendent. If it is not, then the plan is ultra virus, and that's really what's going on. Underneath the surface is the FMO is operating without authority throughout this entire fire. Similar to, you know, a search that, you know, without a warrant. Is he because he's not following the plan? Is that what you said? That is correct, because the plan outlines a way to obtain delegation authority to implement a wildfire response. That is the function, another function of the WFDSS system, is that the fire committee, the fire management committee, which is made up of three members, must come up with this plan, including the FMO. There's nothing in the complaint that says, I mean, maybe I'm wrong, that says, oh, he did something affirmative that he didn't have authority to do, does it? Yeah, in the State Farm Complaints, I think we cite to it in our principal brief, we do say that what he is doing is unauthorized. And that is also what we're saying when they didn't follow the command structure. I guess that sort of gets us back to causation, is given how little he did, that if something that he did was unauthorized, how did that hurt anything? But I guess that, again, has the same causation problem, because you're going back to the paperwork wasn't right. Well, there's a different, also another way to analyze that, Your Honor, besides causation, and it has to do with whether or not unauthorized conduct is the type of conduct that is supposed to be protected by the discretionary function exception. If a government actor is acting in an unauthorized way, then they don't have the discretion. They were never given the discretion to act in the manner they were acting. So then you're saying that he wasn't authorized really to fight the fire at all, because some of the ways he was fighting it were not authorized, which is a little strange, that every time you make a mistake in something, then everything you do is invalid. Are there any cases that say that? Yes, Your Honor. We have Stanford v. United States. It's an Eastern District of Kentucky case from 2014. And Red Lake Band, Chippewa Indians v. United States. That's the D.C. Circuit from 1986. In that case, it says an employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect. If we decide in your favor on these fire-fighting claims, we'd be going beyond what any circuit court has done in the past. Is that true? The circuit court, well, the Reunier case is a Supreme Court precedent from the 1950s, which says that that was an accidentally started fire. The government was negligent in responding to it. The Reunier case says that this was the type of liability that the FTCA was exposing the government to, because this is a traditional common law claim. If the government undertakes exclusively to manage wildfires on federal land, then this is the exact type of claim. They're excluding other people. It's an undertaking analysis. You're excluding the Gatlinburg Fire Department. Is that sometimes the, quote, good Samaritan case, which isn't really involved? Well, voluntary undertaking is a separate section of the Second Restatement of the Torts. But I think it has been referred to as a good Samaritan. If there weren't any other questions, I see that I'm over my time. It's not fair to give us such a tough case. Thank you, Your Honor. Thank you, counsel. Thank you both for your briefs and arguments. The case will be submitted.